### SUPREME COURT.

### JAMES CAVANAGH and others agt. GEORGE T. MORROW and others.

*Insolvent assignment — When a creditor is to be held to have acquiesced in the fact of an assignment by the debtor for the benefit of creditors, and the legality of such assignment, so as to be estopped from claiming that it was fraudulent in its inception.*

When a debtor, in failing circumstances, has made an assignment of his estate for the payment of his debts, his creditors may come in under the assignment and insist that the assignee shall, with fidelity, execute the trust in pursuance of the instrument.    Or the creditors may stand aloof, refusing to recognize the validity of the instrument on the ground of actual fraud or other illegality, and they may institute appropriate proceedings at law or in equity to test the validity of the assignment in the courts.

Creditors have an election as to which course they will adopt.    They cannot pursue both.    Creditors cannot in one moment take steps in recognition of the assignment, and in the line of its strict enforcement, according to its terms, and seek to hold the assignee to its performance, and in the next repudiate it as fraudulent and void.

An election may be implied from the facts and circumstances of the case, and when an election is made it is irrevocable.    Creditors may express their election to come in under an assignment in several ways: "by giving notice to the assignee of the acceptance of it," and less

formally by simply presenting their claims to the assignee for payment or dividend. By coming in under a voluntary assignment, creditors express their election to accept of its provisions, and are considered as acquiescing in the disposition made.

The act of a creditor in verifying his claim and presenting it to an assignee is a recognition of the lawfulness of his title to the assignee's estate, and of his right to administer the same, in payment of the debts of the assignor, as provided for in the instrument. And when a creditor having verified his claim and presented it, goes further and becomes a party to a proceeding for an accounting by the assignee, under the statute, and exercises the right to scrutinize the accounts and to interpose objections to payments and disbursements made by the assignee, he should be held to have acquiesced in the fact of the assignment by the debtor for the benefit of creditors, and the legality of such assignment, so as to be estopped from claiming that it was fraudulent in its inception.

*Special Term, February,* 1884.

*Lewis & Clopton* and *P. Mitchell,* for plaintiffs.

*James L. Bishop* and *John E. Parsons,* for defendants.

VAN VORST, *J.*— The plaintiffs are judgment creditors of the defendant George T. Morrow, and as such bring this action to set aside as fraudulent a voluntary assignment of all his property, made by their debtor George T. Morrow to the defendant Thomas J. Morrow, for the benefit of his creditors. The assignment bears date the 25th day of May, 1880, and it contains preferences. The debtor's estate consisted chiefly of a shoe factory and its contents of manufactured and unmanufactured merchandise, although he owned other property, real and personal, which passed under the assignment.

The assignee took possession of the assigned estate, and converted the same, or a large portion thereof, into money, and applied the proceeds towards the payment of the debts provided for in the assignment. He has still on hand moneys applicable to the payment of debts of the assignor.

The plaintiffs, claiming that the assignment is fraudulent in law upon its face, and also fraudulent in fact, ask that it be

Cavanagh agt. Morrow.

set aside and that a receiver of the property shall be appointed, and that out of the proceeds of the property their judgments shall be paid.

It is argued on behalf of the defendants that under the evidence the plaintiffs are precluded from maintaining this action for the reason that they have confirmed the assignment, and were, at the time of the commencement of this action, seeking to enforce it in a proceeding then and now pending, in the court of common pleas.

The proceeding in the court of common pleas was one instituted by the assignee for an accounting, in pursuance of the provisions of chapter 466 of the Laws of 1877, entitled "An act in relation to the assignment of the estates of debtors for the benefit of creditors," and the amendments thereto. The plaintiffs filed their claims with the assignee, and appeared in the proceeding in the court of common pleas, and interposed objections to the assignee's account. The account and the objections were by that court referred to a referee, before whom testimony was taken. The referee took and stated the account and made his report to the court, showing, amongst other things, the proceeds realized by the assignee of the assigned property, and the disposition made by him thereof in the payment of debts, and the balance of cash remaining in the hands of the assignee applicable to the debts which have not been paid. In these proceeds in the hands of the assignee, the plaintiffs are entitled as creditors to participate.

The action of the plaintiffs in thus filing their claims with the assignee and taking part in the proceedings for an accounting becomes significant when the character and object of the law of 1877 are considered. This act recognizes the right of a debtor to make an assignment of his property for the benefit of his creditors, and provides for the making of an inventory of the assigned estate and the recording of the assignment. It declares that the assignee may advertise for creditors to present to him their claims, with vouchers duly verified, on

or before a day to be specified. The county judge, who has power over the assignee and the trust estate, is authorized, on the application of creditors, to remove an assignee for incompetency. The county judge has power to issue a citation requiring the parties to show cause why an accounting should not be had, on the petition of an assignee or of a creditor. All persons interested in the fund, except creditors who have not duly presented their claims, may appear and take part in the proceeding. The county judge, on the proceeding for an accounting, has power to examine the parties in relation to the assignment and accounting and all questions connected therewith; to require the assignee to file an account of his proceedings, and to take and state such account; to settle and adjudicate upon the account and the claims presented; to decree payment to creditors of their just proportion of the fund, and to execute such further powers in respect to the accounting as a surrogate may exercise in reference to an accounting by an executor or administrator. Every order or decree of the county judge becomes an order of the court and is the subject of appeal.

These provisions of the act above referred to, and others which might be named, show that the proceedings authorized to be taken before the county judge in respect to the accountings of assignees under voluntary assignments, are based upon the validity of an instrument executed and recorded in pursuance of its terms. The act, therefore, of a creditor in verifying his claim, and presenting it to an assignee, is a recognition of the lawfulness of his title to the assigned estate, and of his right to administer the same, in payment of the debts of the assignor, as provided for in the instrument. Unless the act of a creditor in so presenting his claim to an assignee has such significance it would be an idle ceremony. Men are not presumed to take such steps with any other than a useful and lawful purpose. And when a creditor, having verified his claim and presented it, goes further and becomes a party to a proceeding for an accounting by the assignee, under this stat-

ute, and exercises the right to scrutinize the accounts and to interpose objections to payments and disbursements made by the assignee, he acts clearly in recognition of the validity of the assignment and of the propriety of an accounting by the assignee under the assignment.

When a debtor, in failing circumstances, has made an assignment of his estate for the payment of his debts, his creditors may come in under the assignment and insist that the assignee shall, with fidelity, execute the trust in pursuance of the terms of the instrument.   Or the creditors may stand aloof, refusing to recognize the validity of the instrument, on the ground of actual fraud or other illegality, and they may institute appropriate proceedings at law or in equity to test the validity of the assignment in the courts.

Creditors have an election as to which course they will adopt.   They cannot pursue both.   Creditors cannot in one moment take steps in recognition of the assignment, and in the line of its strict enforcement, according to its terms, and seek to hold the assignee to its performance, and in the next repudiate it as fraudulent and void.

The principle of election rests upon the equitable grounds that "no man can be permitted to claim inconsistent rights with regard to the same subject.   *   *   *   A person cannot accept and reject the same instrument, or having availed himself of part, defeat its provisions in any other part; and this applies to deeds, wills and all other instruments whatever" (*Leading Cases in Equity, by W. & T., vol.* 1, *p.* 541; *note to Noys* agt. *Mordaunt, and Streetfield* agt. *Streetfield, and numerous cases cited*).

An election may be implied from the facts and circumstances of the case, and when an election is made it is irrevocable (*Estate of James Burke, Parson's Select Cases, Penn.,* 470).

Creditors may express their election to come in under an assignment in several ways : By giving notice to the assignees of their acceptance of it, " and less formally by simply pre-

senting their claims to the assignees for payment or dividend" (*Burrill on Assignments, sec.* 478 [*4th ed.*], 1882).

By coming in under a voluntary assignment, creditors express their election to accept of its provisions, and are considered as acquiescing in the disposition made (*Idem, secs.* 475, 479, 503).

It may be conceded that it is of the essence of an election that it was made with full knowledge. But that the plaintiffs had knowledge of everything necessary to be known to make an intelligent election, and to determine their line of action, will appear below, where another view of this case is presented.

But it is urged on the behalf of the plaintiffs that they are not concluded by their action in filing their claim with the assignee and appearing in the proceeding in the court of common pleas for an accounting, and filing objections therein, for the reason that the court of common pleas overruled one of their objections and held that the examination of witnesses in the proceeding for the purpose of impeaching the validity of the claims specially preferred in the assignment, was incompetent and improper.

The objections interposed by the plaintiffs in that proceeding were as follows: 1st. That the assignee had not accounted for all the property that had come into his hands. 2d. That he had used the trust estate for the benefit of the assignor. 3. That the allowance of the claims of Cornelius Morrow and three other preferred creditors was illegal, fraudulent and for the benefit of the assignor. 4th. That the amounts paid by the assignee for legal services were illegal. 5th. That the sale of the assets of the trust estate to Cornelius Morrow was illegal, collusive and fraudulent and for the benefit of the assignor, and that the sum realized therefor was grossly inadequate to their actual value.

It will be thus seen that all of the objections made by the plaintiffs in the court of common pleas, except the third, had reference exclusively to the administration by the assignee of his trust according to the assignment. These objections,

in their scope and application, had in view the holding of the assignee accountable for property he had not accounted for, and for payments claimed to have been made improperly and for proceeds he had not realized. These objections all challenged the action of the assignee in his management and disposition of the estate. They all looked to an increase of the funds applicable to the payment of debts, in which the plaintiffs, as creditors of the assignor, were entitled to participate, and from which they might receive a dividend. They were in support of, and not against, the assignment.

The third objection, however, in effect sought to impeach the claims of certain preferred creditors, but this not directly and in words. The objection was that the allowance of those claims was illegal, and for the benefit of the assignor. As stated and in form, the objection is that the assignee should not in his account be credited with these payments. Could the plaintiffs have succeeded in their contention under the objection made, they would have, to the extent of such payments, increased the amount to be distributed among the general creditors. But the court of common pleas properly enough excluded this objection, leaving to the plaintiffs the right to prosecute their other objections, which challenged the administration of the trust estate. They so excluded this objection, because the proceeding in that court to which the plaintiffs were parties was founded upon an administration of the trust estate according to the terms of that instrument. And that a creditor so appearing and taking part in the accounting could not attack the instrument itself. One position was inconsistent with the other.

The conclusion reached, therefore, in respect to the action of the plaintiffs in the court of common pleas, is that it was a recognition of the assignment, and of the liability of the assignee to account for the proceeds of the assigned estate according to the terms of the deed of trust. But, irrespective of their participation in the proceedings in the court of common pleas, the plaintiffs are estopped by their conduct and

action in recognition of the validity of the assignment from now seeking to impeach it.

The plaintiffs and other creditors of the assignor became aware of the assignment immediately after it was made, and commenced at once to investigate the condition of the assigned estate and its value, and advised the assignee as to its administration. A meeting of creditors was called and a committee was appointed to examine into the condition and value of the estate, and to guard their interests in its administration. The plaintiff Cavanagh was one of that committee. The members of the committee were all business men familiar with the matters and interests to be examined. The books and papers and property were exposed by the assignee to the examination and inspection of the committee of creditors. The inventory of the assigned estate, as well as the claims against it, were examined and discussed. The property was valued by the committee, and what it would probably realize for the purposes of the assignment was ascertained by them. Creditors, including the plaintiffs, authorized the assignee, by a writing signed by them, to " go on and finish up the unfinished stock at the factory," and " to put it in a condition for sale in the market, and further, that he be empowered to buy sufficient raw material to work up into manufactured form the unfinished work and all other material on hand."

The most valuable part of the trust estate consisted of the factory, and the merchandise manufactured and unmanufactured on hand. As to what the merchandise would bring at a sale thereof, at public or private sale, was discussed. The assignee seemed disposed to adopt either course, and to sell by auction, or otherwise, so that the best price should be realized.

The plaintiff Cavanagh, although he believed the stock was worth $47,000, offered himself to purchase it from the assignee for the sum of $30,000. If his valuation was a correct one, this would have yielded him a large profit. Yet he was disposed to take it to himself. The only other offer made for the stock as a whole was $25,000. Cavanagh in the

end, however, withdrew his offer of $30,000 and advised the assignee to sell the stock to Cornelius Morrow, a brother of the assignor, for $27,500.

The testimony of the plaintiff Cavanagh upon this subject is not without interest, in view of the fifth objection interposed in the court of common pleas, and which has been urged against the assignment on this trial. The assignee having told him that he had advertised the property for sale, and having asked the advice of Cavanagh as to the value of the property, Cavanagh, using his own words, said: "I told him that I stood ready to give $30,000 for it. He said that he hadn't got but one offer of $25,000; he didn't suppose that he would get any higher offer. I then said to him, why don't you sell it to your brother Cornelius; he would give as much for it as anybody, and you seem disposed to keep the property in your family. Well, he says, I don't know that Cornelius would give $25,000. Anyway, I says, suppose you try him. He said he would go and see what Cornelius would give." The same witness further said, when a paper was handed to him to sign, consenting to a sale to Cornelius Morrow: "Before I signed the paper I asked Mr. Morrow how we were going to get our thirty-five cents which he agreed to give us in his compromise paper. Mr. George Morrow said that that would be settled; that he proposed to pay me the thirty-five cents anyway; and when Thomas Morrow came in I asked him if he understood that to be the fact — that I was to get my thirty-five cents. He says 'yes, you will get your thirty-five cents in two weeks.' I then said to him : 'Now, I want you to understand that I am willing to pay $30,000 for this property, but for the sake of Mr. Morrow and the family I am willing to withdraw my offer on condition that you give me that thirty-five cents."

This occurred during the time the committee of creditors, of which Cavanagh was one, was engaged in the examination of the property and assets.

The committee having completed their work, reported to

the body of creditors that they had examined the books and other assets of the assignor, and that a sub-committee had made a careful examination of the stock, machinery and merchandise. That it was agreed to report the value of the merchandise and machinery at $47,567.63. "That the books of the assignor were found in good condition, and the accounts showed the state of the business, and that no difficulty was experienced in getting at the facts and figures." The committee in their report also gave their estimated value of the other property, and stated the amount of the unsecured debts preferred in the assignment. They stated that in the event of the business being wound up by the assignee, there would be a considerable loss to the estate on preferences secured by collaterals. Afterwards the creditors, including the plaintiffs, by a writing executed by them severally, authorized and empowered the assignee to accept an offer made for the stock and machinery by Cornelius Morrow, the offer being $27,350 for the merchandise and machinery, and $12,000 for the factory, the same being the largest offer which, after the advertisement, had been obtained. The merchandise and machinery were then sold by the assignee to Cornelius Morrow for the sum named.

This conduct and action on the part of the plaintiffs, I apprehend, is an acquiescence in the fact of the assignment and its legality and in the right of the assignee to manage the assigned estate, and to dispose of the same for the benefit of those interested under the deed of trust, in pursuance of its terms. And this line of conduct and action was deliberately taken after full means of knowing all the facts in regard to the terms of the assignment, the extent of the claims preferred and their nature, the value of the assigned estate, and the purposes to which it was by the deed devoted.

It is no answer to the conclusion which such conduct on the part of the plaintiffs suggests that the creditors were moved with a desire to effect a compromise with their debtor. That they should desire such a compromise, and also that the

Cavanagh agt. Morrow.

assigned estate should realize the most for the adjustment of their claims, was reasonable. But any amount they might hope to receive out of this property was based upon the amount to be realized after payment of the debts preferred by the assignment. All the creditors did not, however, come in, and the compromise was not consummated. The plaintiffs cannot in reason complain, either that they have not had sufficient opportunity or means, before deciding upon the course they should adopt, to investigate all matters necessary to be known understandingly. If there was a fraud in the inventory of assets, the property was before them and they examined it.

The books, which they have said were well kept, were opened to them, by which the fairness of the preferred debts could be tested. The factory and its contents was open to their inspection. If the assignment was designed to accomplish fraudulent ends they should not have acknowledged it, but should have spurned it from the beginning. The fact that they treated with the assignee, acted with and advised him in the way above mentioned, is evidence that they did not regard the assignment as a fraud upon their rights.

Such conduct and action on the part of the plaintiffs I conclude to be a ratification of the assignment, and an election on their part to regard it as a transfer, legal and proper in itself.

And having taken such an attitude, a court of equity cannot do otherwise than hold them to their election. And although they may have been disappointed in what they expected to gain by the course they pursued, they cannot, in a court of equity, change their position to one of hostility, and seek to wrest from the assignee the remaining assets to be applied to the satisfaction of their judgments, upon the ground that the deed was fraudulent in its inception.

Notwithstanding the contention of the learned counsel of the plaintiffs, I do not regard the assignment as fraudulent upon its face; but entertaining the views above expressed, I do

not deem it important to pass upon the other questions in the case, as I conclude that for the reasons above given the plaintiffs' complaint must be dismissed, with costs.